UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| HENRY L. KLEIN, _PRO SE_, | * CIVIL ACTION |
| AND ON BEHALF OF ALL | * |
| OTHERS SIMILARLY-SITUATED | * |
| | * NO. |
| VERSUS | * |
| | * |
| THE AMERICAN LAND TITLE ASSOCIATION, | * SECTION |
| FIDELITY NATIONAL FINANCIAL GROUP, | * |
| FIRST AMERICAN TITLE INSURANCE | |
| COMPANY, STEWART TITLE GUARANTY COMPAI | |
| AND OLD REPUBLIC NATIONAL TITLE | |
| INSURANCE COMPANY | |

Case: 1:12-cv-01061
Assigned To : Walton, Reggie B.
Assign. Date : 6/26/2012
Description: Pro Se General Civil

*************************************

**ORIGINAL COMPLAINT**
**FOR DECLARATORY JUDGMENT AS TO ALTA TITLE POLICY PROVISION 8(a);**
**FOR DECLARATORY JUDGMENT REGARDING THE _"MCCALL DECLARATION"_;**
**FOR DECLARATORY JUDGMENT THAT THE UNILATERAL RIGHT**
**TO APPLY PROVISION 8(a) ELIMINATES PROTECTION**
**UNDER THE _FILED-RATE DOCTRINE_ BECAUSE**
**IT MAKES _THE AMOUNT OF INSURANCE_ A MOVING TARGET;**
**FOR DECLARATORY JUDGMENT THAT TITLE INSURANCE**
**IS NOT _THE BUSINESS OF INSURANCE_**
**AND NOT PROTECTED BY MCCARRAN-FERGUSON;**
**FOR CLASS CERTIFICATION AND DAMAGES TO CLASS-MEMBERS;**
**FOR TREBLED DAMAGES FOR VIOLATIONS OF 15 U.S.C. § 1**
**AND 15 U.S.C. § 15; AND FOR OTHER LEGAL AND EQUITABLE RELIEF**

_I._

**_JURISDICTION AND VENUE_**

1.    Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, all as hereinafter more fully set forth.

2.    Jurisdiction is also invoked pursuant to 28 U.S.C. § 1332, in that there exists full diversity of citizenship between plaintiff, a citizen of Louisiana, and all defendants which are citizens of States other than Louisiana, as follows: American Land Title Association ("**ALTA**"), a citizen of the District of Columbia; Fidelity National

⸜ 6 2012

Financial Group, **NYSE:FNF** ("Fidelity National"), a citizen of the State of California; First American Title Insurance Company, **NYSE:FAF** ("Fidelity National"), a citizen of the State of California; Stewart Title Guaranty Company, **NYSE:STC** ("Stewart"), a citizen of the State of Texas; and Old Republic National Title Insurance Group, **NYSE:ORI** ("Old Republic"), a citizen of the State of Minnesota, sometimes referenced herein as the "*Four Families of the Title Insurance Industry*"; the amount in controversy, exclusive of interest, penalties, attorney's fees and costs, exceeds $75,000.

3.     Jurisdiction is also invoked pursuant to 28 U.S.C. § 1337(a), in that this action arises under Acts of Congress regulating commerce and protecting commerce from restraints of trade, including 15 U.S.C. § 1, known as the Sherman Act, and 15 U.S.C. 15, known as the Clayton Act, as well as Acts of Congress prohibiting false, misleading and deceptive acts and practices, including 15 U.S.C. § 58, known as the Federal Trade Commission Act, and specifically Section 5, 15 U.S.C. § 45(a), all as hereinafter more fully set forth.

4.     Supplemental jurisdiction is also invoked pursuant to 28 U.S.C. § 1367 in that there are common-law and state-law claims arising from the nucleus of facts set forth herein "...which are so related to the claims as to which this court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution...", including but not limited to common law fraud and deception as to the meaning and use of ALTA policy provision 8(a)(ii) in the instance of Owner's Policies, and ALTA policy provision 8(a)(iii) in the instance of Lender's Policies, as more fully set forth in the section entitled **_THE MCCALL DECLARATION REGARDING POLICY PROVISION 8(a)_**, at ¶¶ 20-27, _infra_.

2

5.    Venue is proper in the District of Columbia in that ALTA, which plays _the_ role of scrivener for the title insurance industry and is "...the voice of the title and abstract industry..." is domiciled and maintains principal offices at 1828 L Street NW, Washington, D.C. 20036.

6.    Venue is particularly proper in the District of Columbia pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because ALTA is the key player in the Sherman 1 _combination_ between ALTA and all title insurers, agents, abstractors and related parties, as more fully set forth, _infra_[1].

7.    All ALTA subsidiaries and affiliates are based in Washington, D.C., including ALTA's Land Title Institute ("LTI"); ALTA's Title Industry Assurance Company ("TIAC"); ALTA's Action Center ("AAC"); and ALTA's Title Industry Political Action Committee ("TIPAC"), making the District of Columbia the most convenient venue for deciding issues which adversely impact property owners throughout these United States.

## II.

## *STANDING*

8.    Henry L. Klein ("Complainant"), is a guarantor of two loans as to which Commonwealth Land Title Insurance Company ("Commonwealth"), a subsidiary of Fidelity National, issued Loan Policies and Zoning Endorsements as follows: (i) ALTA LOAN POLICY OF TITLE INSURANCE No. L-14-0005193 in the amount of $5,126,000 in favor of First NBC Bank in New Orleans ("First NBC"), and (ii) ALTA LOAN POLICY OF TITLE INSURANCE No. L-14-0005195 in the amount of $11,614,548 in favor of the Louisiana Office of Community Development ("OCD"), both which remain unpaid despite multiple demands by Complainant and a direct demand by First NBC.

---

[1]    "Every contract, _combination_ in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. 1.

3

13. Complainant brings this action, *pro* *se* and on behalf of all other similarly-situated guarantors of loans because financial institutions throughout the United States *mandate* that borrowers purchase Loan Policies in addition to Owner's Policies, unnecessarily increasing the premiums paid at all closings except in the State of Iowa[3].

14. Finally, Complainant brings this action, *pro* *se* and on behalf of all other similarly-situated guarantors of loans (i) seeking declaratory judgment that title policy provision 8(a)(iii) in Loan Policies is ambiguous, deceptive and misleading and cannot be utilized to limit liability in cases where zoning impairs the *use* of the property, but not the title; (ii) for declaratory judgment that title insurance is not "the business of insurance" and not protected by the McCarran-Ferguson Act; (iii) for declaratory judgment that the insurer's unilateral right to apply provision 8(a)(ii) in Owners Policies and provision 8(a)(iii) in Loan Policies eliminates protection under the *Filed-Rate Doctrine* because it renders the Amount of Insurance a "...moving target..." impossible to actuarially measure; (iv) for class certification and damages to the class; (v) for treble damages for violations of 15 U.S.C. § 1; and (vi) for all just and equitable relief.

---

[3]     Iowa prohibits the sale of *any* title insurance whatsoever, *The Truth about Title Insurance Needs to be Told*, The Iowa Lawyer, January 2003; *Title Insurance: A Fleecing of America and Why it is Important to Keep it out of Iowa*, Iowa State Bar Association, 2005.

Additional criticism of the practice on the part of financial institutions to mandate that loan policies be purchased in addition to owner's policies is found in the following treatises and publications: *Title Insurance Fees Paid by Borrowers Include Referral Costs*, Jack Guttentag, March 21, 2005; *Banks as Title Insurance Referral Agents? The Convergence of Financial Services*, Boyer & Nyce, *Scientific Series*, Centre Interuniversitaire de Recherche Analyse des Organisations, September 2002; *Suit Calls for Reform, Refund*, Wendy Brown, The New Mexican, March 30, 2006; *Top Four Title Insurers Pay an Average of About 80% of Title Insurance Premiums to Their Title Agents in Form of Commissions*, J. Robert Hunter, Title Insurance Costs and Competition, April 20, 2007 @ p 11; and *Insurance Division Alleges Kickbacks*, Erin Johansen, Denver Business Journal, January 14, 2005.

## *FACTUAL BACKGROUND*

15.   On October 7, 2008, Lewis Title sold the three Commonwealth policies described in ¶¶ 11 and 12, together with ALTA Zoning Endorsements which insured (i) Levy Gardens, (ii) First NBC and (iii) OCD against any "...loss or damage..." sustained or incurred in the event that on October 7, 2008, multifamily housing was not a permitted use of the property upon which Levy Gardens planned to construct a 100-unit post-Katrina development.

16.   Rather than conducting a thorough abstract, Lewis Title relied on a letter from a city employee in the zoning department, opining that multifamily housing was a permitted use, and thereupon sold $35,063,618 in coverage underwritten by Commonwealth.

17.   As it eventuated, Lewis Title missed a 1985 Zoning Ordinance which *prohibited* the use insured, resulting in litigation wherein Levy Gardens was enjoined from completing the development after it had spent over $7,133,567, East New Orleans Neighborhood Advisory Commission v. Levy Gardens, 22 So.3d 169 (La.2009).

18.   For over 900 days after a claim was made under the Zoning Endorsement, Commonwealth (i) *refused* to communicate with Complainant, (ii) *refused* to investigate the claim, (iii) *refused* to engage in any adjustment process, and (iv) *refused* to tender any payment under any of the three Policies of Title Insurance and Zoning Endorsements.

19.   In litigation which followed, Levy Gardens v. Lewis Title, 2011 WL 1882664, the United States District Court for the Eastern District of Louisiana ruled that Levy Gardens was insured for the precise reason it purchased title insurance "...and paid extra for a zoning endorsement to be included therein..." *Id*, at page 10.

### *THE MCCALL DECLARATION REGARDING POLICY PROVISION 8(a)*[4]

20. Just prior to trial on the "...loss or damage..." sustained, Commonwealth made a *stealth* reference to the provision 8(a) limitation described in ¶¶ 10 and 11, *supra*, in a Sur-Reply not recognized by Federal Rule 7 as a "pleading", arguing that Commonwealth's exposure was not, after-all, the "Amount of Insurance" described in [any] policy[5].

21. At the trial of the Owner's Title case, limited to the issues under ALTA Owner's Policy E-14 0005523[6], Commonwealth called as its key witness, one Charles S. McCall ("McCall"), to testify about the manner in which provision 8(a) was applied by the title insurance industry; McCall *confirmed* that the policies written by ALTA are not what they appear to be, proving beyond cavil that title insurance is an *illusion*.

22. McCall was and continues to be a highly-respected and highly-placed spokesperson for the industry: he is "...*the* national *major* claims counsel for the Fidelity National Title Group..." He "...carr[ies] the title of *senior* vice president..." As *the* national *major* claims counsel, McCall is "...responsible for handling claims where there is potential exposure, generally of somewhere certainly in excess of $1 million, usually in excess of $5 million, *all over the country*..."

23. Fidelity National is *the* most powerful member of an industry controlled 63.9% by the Fidelity and First American families[7].

---

[4]    In the context of *this* case, we believe that the McCall Declaration sinks the *title* insurance industry, as made clear throughout this Complaint for relief long overdue and much anticipated by detractors of the *title* insurance industry.

[5]    We say "stealth" for good reason. Not once in 900+ days did Commonwealth claim in any communication to Complainant or to Levy Gardens that the Amount of Insurance was *not* the amount of insurance.

[6]    2011 WL 1882664, at 6.

[7]    Demotech: *2011 Performance of Title Insurance Companies*; see also, ¶ 92.

24. Speaking authoritatively, McCall testified as to how damages should be calculated when there was a claim of loss under a policy:

> Q. Is there a provision in the policy for the calculation of damages if there is a loss?
>
> A. Yes, there is a Condition No. 8 that specifies how damages are to be determined.
>
> Q. And is there any other provision in the policy for calculating them?
>
> A. ***I am not aware of any other provision[8].***

25. After 900+ days of *refusing* to articulate the provision 8(a) avoidance defense, Commonwealth declared that the *only* damage measure was the lesser of the Amount of Insurance or "...the difference between the value of the Title as insured and the value of the Title subject to the risk insured against..."

26. On November 11, 2011, the district court in the Owner's Policy litigation *accepted* McCall's declaration of the coverage and awarded Levy Gardens $605,000, specifically declining to rule on the ALTA Loan Policies in favor of First NBC and OCD, as that court had the option to do pursuant to § 24 of the Restatement 2nd of the Law of Judgments[9].

27. As exemplified by Exhibit A, on November 29, 2011, McCall invoked provision 8(a) as a limitation of liability of a total of $605,000 *under all three policies*, meaning that Lewis Title sold Levy Gardens, First NBC and OCD $35,063,618 in *illusory* title insurance underwritten by Commonwealth, which could be (and was) diminished to almost nothing by the *unilateral* invocation of provision 8(a).

---

[8]     Relevant pages of McCall's sworn testimony are made Exhibit B.

[9]     The Owner's Policy ruling is on appeal to the Federal 5th Circuit Court of Appeals in the matter of Levy Gardens Partners v. Commonwealth, No 12-30010. *None* of the parties to *this* litigation are parties in the 5th Circuit, which deals with a different coverage as to which the district court *declined* jurisdiction.

8

## *THE BINDING EFFECT OF THE MCCALL DECLARATION*

28.    The McCall Declaration gives credence to all of those who have been calling for the guillotine to fall: *Inside America's Richest Insurance Racket*, Scott Woolley, Forbes, November 13, 2006; *Why Title Insurance?*, Albert Rush, Mortgage Banker, August 2000; *How Long Will the Good Times Roll?* Auden and Palowski Special Report, March 20, 2008; *Title Insurance: is it wanted here?* New South Wales Law Journal, November 2002; *Title Insurance: Getting Ripped Off?* Les Cristie, Good Morning America, January 11, 2006; *Title Insurance Profits Excessive by Any Reasonable Measure*, Bernard Birnbaum, Report to California Insurance Commissioner, December, 2005; *The Antitrust Suits and the Public Understanding of Insurance*, George L. Priest, Vol 63, Tulane Law Review; *Despite Fines, Insurers likely to Keep Giving Kickbacks*, Los Angeles Business Journal, November 1, 1999; *Fidelity Title to Refund $2.2M to Florida Residents, Fined $1M*, The Title Report, September 2005; *Major Players in Title Industry Stifle Reform*, Jack Guttentag, Inman News, July 3, 2006; *The American Title Insurance Industry: How a Cartel Fleeces the American Consumer*, Eaton & Eaton, NYU Press, 2007.

29.    Neither McCall nor ALTA nor Fidelity National nor Commonwealth nor the industry can recant: in a case where $35 million in insurance was sold, McCall and Commonwealth persuaded a federal district judge that the Amount of Insurance was not the amount of insurance and a stunning victory was gained; the United States Court of Appeals for the District of Columbia has made it clear in <u>Konstantinidis v. Chen</u>, 626 F.2d 933 (C.A.D.C.1980), that when a party convinces one judicial body to adopt factual contentions, that party cannot tell another court that those contentions were false.

30. Success in the prior proceeding is an essential element of judicial estoppel and the industry is now on record as selling insurance which allows the underwriter 900+ days to change the amount of the face value of a policy to nearly zero without suffering any consequences.

31. In addition to the issue of the abuse of the 8(a) provision in loan policies, this class action will consider whether retrospective title insurance is really "insurance" protected by the McCarran-Ferguson Act and whether the *Filed-Rate Doctrine* applies when provision 8(a) makes the Amount of Insurance a "...moving target..." not possible to consider when rates for premiums are submitted to Insurance Commissioners[10].

32. This class action will also present the fact that once a claim is made, the relationship between the insured and the insurer, the most important aspect of the business of insurance, collapses and the fight for the money in the insurer's pocketbook begins, a matter deplored by the applicable law, Proctor v. State Farm, 561 F.2d 262, (C.A.D.C.1977).

33. This class action will also consider the NAIC failure to regulate the claims-adjustment process; it is well-documented and undisputed that NAIC does *not* monitor, police or regulate the claims-adjustment process in the title insurance industry:

> *"THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS (NAIC) AND MOST STATE REGULATORS DO NOT REQUIRE THAT TITLE INSURANCE COMPANIES FILE WITH THEM DETAILS ABOUT EACH CLAIM WHERE COVERAGE WAS REFUSED OR WHERE SUCH REFUSAL WAS CONFIRMED IN A COURT OF LAW.[11]"*

---

[10] On June 14, 2012, in the matter of McCray v. Fidelity National, Docket No. 10-3576, the 3rd Circuit Court of Appeals upheld the *Filed-Rate Doctrine*, Retired Associate Justice O'CONNOR concurring.

The McCray court, however, did *not* consider the McCall Declaration, the 8(a) "moving target" issue, or the issue of lack of state regulation of the claims-adjustment process, which here allowed 900+ days of disregard to go unpunished.

[11] *How a Cartel Fleeces the American Consumer*, Eaton & Eaton, at page 19.

## ***MCCARRAN-FERGUSON INAPPLICABLE TO TITLE INDUSTRY***

34.   *This* action constitutes an exception to the protection provided by the McCarran-Ferguson Act, 15 U.S.C. § 1011 ("McCarran-Ferguson"), because the provisions of the Sherman, Clayton and Federal Trade Commission Acts are "...applicable to the business of insurance to the extent that such business is *not* regulated by state law..." or is *minimally* or *inadequately* regulated by state law[12].

35.   Because the protection of McCarran-Ferguson applies to the "...business of insu*rance*..." and not to the "...business of insu*rers*...", Group Life & Health v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), there is absolutely *no* immunity as to the actions brought for the benefit of the members of this class and for all insureds as well: once a direct claim is made, the insurer becomes the enemy of the insured and the ensuing fight for the money in the coffers of the title insurance company trumps fidelity and fair dealing.

36.   Additionally and fundamentally, *this* action is not subject to the McCarran-Ferguson Act because title insurance is *retrospective* and does *not* transfer "risks" as to matters *a futuro*[13]; the term "insurance" in a title or zoning context is a misnomer because the contracts at issue are nothing more than "warranties" regarding the condition of the title to the property and the permitted use on the day of issue.

---

[12]      Complainant recognizes that McCray rejected the "...no meaningful regulation..." argument as to rate-filings, but only as to rate-filings. *Our* argument here addresses (i) the failure to regulate the claims-adjustment process, where the insured gets hurt the most and (ii) the failure to regulate deceptive practices such as the invocation of provision 8(a).

[13]      Group Life, citing: *Insurance is an Arrangement for Transferring and Distributing Risk*, 1 G. Richards, The Law of Insurance, § 2.

37. _Existing_ ordinances, mortgages, liens, alienations and use prohibitions are _not_ "risks" on the day of issue; they are _not_ "contingencies" waiting to happen; they are "facts" which have _already_ occurred and which are warranted-against by an abstractor or a lawyer; because the past _cannot_ be insured-against, title policies are _not_ part of the "business of insurance".

38. _This_ action is _not_ brought against any other aspect of the business of insurance, and does _not_ suggest that state regulation of Life Insurance, Health and Accident Insurance, Industrial Insurance, Fire Insurance, Casualty Insurance, or Re-Insurance of any of those aspects of the business of insurance is inadequate; rather, this action is based _solely_ on issues involving _title_ insurance and the false, misleading and deceptive manner in which _title_ insurance policies are sold with a built-in "escape hatch" in the form of provision 8(a).

39. The pre-cursor to McCarran-Ferguson was the decision in United States v. South-Eastern Underwriters Association, 232 U.S. 523, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), correctly noting that the rights of everyday human beings were impacted by "insurance", at 1167:

> "Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business. **_Insurance touches the home, the family, and the occupation or the business of almost every person in the United States._**"

40. The immediate focus by the insurance industry resulting from South-Eastern was upon insurer-reluctance to pay taxes to states, possibly violating the constitutional prohibition against taxation of interstate commerce, but _not_ about the _regulation_ of the "...business of insurance...", a phrase that itself has raised significant questions among constitutional scholars, Emasculation of McCarran-Ferguson: A study in Judicial Activism, 1985 Utah Law Review 1.

41.    In testimony before the House Judiciary Committee, to whom Senator McCarran's Senate Bill 340 was referred, Attorney General Francis Biddle provided guidance on taxation, but not on *regulation* of insurance, emphasizing that speed was needed in order to get the insurance companies back to paying taxes to the states[14].

42.    Significantly, on February 13, 1945, in the final report from the Judiciary Committee, *Expressing the Intent of Congress with Reference to the Regulation of the Business of Insurance*, there was *no* exception to McCarran-Ferguson, and Section 2(b) read as follows:

> "(b) No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically so provides."

43.    Nine days later, in order for the Senate to "...recede from disagreement..." with the proposed bill, Section 2(b) was amended to include an exception to immunity, or a window of opportunity for the enforcement of the antitrust laws in the event that any aspect of the "business of insurance" was **NOT** regulated by state law, to-wit:

> *Provided, that after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance **to the extent that such business is NOT regulated by state law**."*

44.    In addition to the reluctance by the Senate, the NAIC also *opposed* a blanket antitrust exemption in favor of the insurance industry in general, *90 Congressional Record at 8482 (1944)*, meaning that the

---

14      "Mr. Biddle: Let me again emphasize the great desirability of speed...some of the taxes have been held up awaiting this issue...but the main thing is the taxing..." February 18, 1945, at HR 1973, at pp 4-5.

immunity as to these defendants was "hanging by a thread" in 1945 – a thread which has now been broken by the *unregulated* ignoring of insureds, as occurred between your Complainant and Commonwealth for over 900 days.

45. If the immunity was a Congressional gift, it has been forfeited by the *title* insurance industry and must be returned to the Congress; if immunity was a *quid pro quo*, the *title* industry failed to deliver the "regulation by state law" expected by the Congress.

46. The proposition that the title insurance industry has overstayed its welcome is fortified by the United States Supreme Court decision in Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed 2d 709 (1986), widely considered to reject liberal application of immunities (*Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored.*)

47. This class action is also brought against ALTA and the *Four Families of the Title Insurance Industry* in this forum because it is "ALTA the scrivener" which supplied the industry with provision 8(a), a false, misleading and deceptive practice *not regulated by state law*.

48. Complainant respectfully requests judgment declaring that title insurance is *not* protected by McCarran-Ferguson immunity, as a consequence of which the Federal Trade Commission would be in a position to take appropriate action regarding the false, misleading and deceptive use of provision 8(a), and the Sherman Act would be available to redress the abuse of oligopoly power and the lack of price and product-quality competition among the members of the industry.

*IX.*

### *THE FILED-RATE DOCTRINE, McCRAY AND THE 8(a) "MOVING TARGET"*

49. The *Filed-Rate Doctrine* can best be traced to two significant Supreme Court decisions, Keogh v. Chicago & Northwestern, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), and Square D v. Niagra Frontier Tariff

14

<u>Bureau</u>, 476 U.S. 409 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), both of which dealt with the Interstate Commerce Commission, a *serious* regulatory body hardly comparable to the State Insurance Commissioners who, as we show below, have <u>no</u> uniformity as to the regulation of the claims-adjustment process, where it is the insured vs. his own insurer, *mano-a-mano*.

50. Any consideration by this court regarding the lack of regulation as to the misleading and deceptive application of provision 8(a)(ii) in owner's policies and 8(a)(iii) in lenders policies will constitute a *res nova* inquiry not made in <u>McCray</u> or in any other case with which we are familiar.

51. Given the lack of 1945 enthusiasm for antitrust immunity as to the business of insurance in general, and given the gluttony exhibited by the *title* industry and the vulgar profits we discuss, *infra*, the admonition by the United States Supreme Court in <u>Carnation Co. v. Pacific Westbound Conference</u>, 383 U.S. 213 at 218, 86 S.Ct. 781, 15 L.Ed 2d 709 (1986) is the better path to follow:

> "We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that **we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry."**

52. Because <u>no</u> regulation is in existence over the claims-adjustment process, no McCarran-Ferguson immunity is appropriate.

53. An additional matter raised by this action which was not addressed by the court in <u>McCray</u> is the fact that once a claim is made, the *relationship* between the insured and the insurer, *the* most important aspect of the "...business of insurance...", <u>Proctor v. State Farm</u>, 561 F.2d 262, (C.A.D.C.1977), collapses and there is *nothing about that "collapse" that is protected by the Filed-Rate Doctrine*.

15

54.   Applying the rationale by the Court of Appeals for the District of Columbia Circuit in Proctor, that court agreed that the process of settling claims, adjusting claims and generally dealing with the policyholder was _the_ "...business of insurance...", stating, at 267:

> "But whatever the exact scope of the statutory term, it is clear where the focus was: it was on the _relationship_ between the insurance company and the policyholder. Statutes aimed at protecting or regulating this _relationship_, directly or indirectly, are laws regulating 'the business of insurance'."

55.   In the instance of Complainant's insured/insurer relationship, Commonwealth (i) turned against Complainant as soon as there was a claim that required investigation, adjustment and payment, (ii) hired mega-lawyers to obstruct and fight off Complainant's efforts to commence the adjustment process, (iii) refused to even _meet_ with Complainant or anyone connected with Complainant for over 900 days, (iv) took the position that the $35,063,618 Amount of Insurance sold was really only $605,000, and (v) kept all the premiums, all the while engaging in litigation tactics intended to wear Complainant down to the point of "...exhausted compliance...", a matter deplored by the United States Supreme Court in Chambers v. NASCO, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 227 (1991).

56.   Commonwealth's 900+ day delay in declaring that provision 8(a)(ii) applied as to the owner's policy, and now as to the lenders' policies, made the Amount of Insurance in all three policies a "moving target" capable of being reduced at the whim and caprice of the insurer.

57.   In McCray, the rates considered were premiums computed on the amount of insurance sold; but if the Amount of Insurance can be severely lowered after-the-fact by invoking provision 8(a), as industry spokesperson McCall solemnly swore, then the premiums are _also_ a "moving target" insusceptible of actuarial calculation and _always_ an overcharge.

16

58. On this point, the McCray court ruled that rates must not be unfairly discriminatory, the exact *opposite* of the invocation of provision 8(a) unequally, unevenly, and at the whim of the insurer[15].

59. Complainant, *pro se*, and on behalf of all other similarly-situated situated *guarantors of illusory title insurance* respectfully submits that the *Achilles Heel* of the title insurance industry is not so much the fixing of premium prices, but the lack of state regulation of the claims-adjustment process and the lack of state regulation as to the deceptive language of ALTA policies, all of which contain provision 8(a).

60. Although apparently rejected in McCray, but in order to preserve the issue, Complainant respectfully submits that the application of the *Filed-Rate Doctrine* is incongruous with reality insofar as *title* insurance is concerned, for the following reasons, to wit:

> ❑ As opposed to traditional insurance, title insurance has no *aggregate loss information* to provide to rating bureaus;
>
> ❑ Title insurance is retrospective, does *not* spread risk as to future events, making rate-filing insusceptible of scrutiny or meaningful review;
>
> ❑ In the case of title insurance, there is no accepted calculus to apply and there is no "...special expertise of a regulator..." to protect from second-guessing litigants[16];

---

[15] The application of provision 8(a) owners and lenders policies is *subjective* and capable of various methods of measuring "appraised value" or "market value" or "title value". The provision must therefore be read against the insurer, which was the *exact* ruling in In re Evans, 460 B.R. 848 (2011), at 895-896, involving Old Republic and ALTA Lender's Policy containing provision 8(a)(iii).

[16] The doctrine assumes regulators are expert at statistical analysis and ought not be second-guessed by litigants, referenced in McCray as the "nonjusticia-bility strand" at page 18. But the title insurance industry has no prior statistics to consider and nothing to quantitatively analyze. No one can second-guess the Commissioners on title insurance *because the Commissioners themselves are guessing.*

❏   The Congressional gifting of antitrust
    immunity by Senator McCarran was not
    meant to be all-inclusive and was
    intended to protect only "...reliable
    insurers...", Proctor, at 267;

❏   Because no antitrust offense is more
    pernicious than price-fixing, states
    must exercise sufficient independent
    judgment and control so that the
    details of the rates and prices
    "...have been established as a product
    of **deliberate state intervention**...",
    F.T.C. v Ticor, 504 U.S. 621, 639, 112
    S.Ct. 2169, 119 L.Ed.2d 410 (1992).

*X.*

## *SEPARATION OF POWERS PRINCIPLES*

61.   Congress has always maintained the right to delegate the
enforcement of laws to the several states and did exactly that when it
passed McCarran-Ferguson.

62.   Congress, however, did *not* require follow-up (i) in the
monitoring of the state regulation of the business of title insurance or
(ii) in any requirement upon the members of NAIC to report to the
Congress the quantity or the quality of the regulation assumed.

63.   During debate in the 79th Congress, Representative SUMMERS of
Texas made the point that the Congress expected the States to:

> "...demonstarate their ability *properly* to govern
> the business of insurance. Insurance companies
> should do their best to remove from their practices
> anything which might be detrimental to the public
> interest." *Congressional Record, March 14, 1945,*
> *at Appendix 1190*.

64.   Given the lack of any meaningful regulation of the title
insurance industry, the passage of McCarran-Ferguson, as to title
insurance -- which is not "insurance" at all -- may have been a nullity
*ab initio*, or may no longer apply 67 years later, as we discuss below[17].

---

[17]   See, **WHAT THE 79TH CONGRESS NEVER ENVISIONED**, ¶¶ 97-103, *infra*.

18

65. Your Complainant requests that the court make a declaration, in due course, that the *title* insurance industry is unprotected by McCarran-Ferguson as a matter of Constitutional Separation of Powers Principles gone awry.

*XI.*

## *THE ROLE OF NAIC*

66. The National Association of Insurance Commissioners ("NAIC") was *the* entity Congress looked to in 1944-1945 when the insurance industry was gifted with not having to face the Sherman Act, The Clayton Act and the Federal Trade Commission Act; that *quid pro quo* was based on the expectation that the members of NAIC would be *the* regulatory body upon whom the Congress could rely.

67. As to title insurance, however, (i) the NAIC does *not* regulate title insurers; (ii) the NAIC does *not* police the adjustment practices of the title companies, *where the consumer is hurt the most*; (iii) the NAIC does *not* monitor the anti-competitive practices of the title industry, and (iv) the NAIC does *not* supervise, police or regulate-rate making other than moving submissions from a mailbox to a file cabinet.

68. One of the avowed tasks of the NAIC is that of "...improving state regulation of insurance..." in which regard the NAIC has particularly failed in connection with (i) the claims-adjustment process and (ii) the use of deceptive practices regarding condition 8(a), neither of which was presented or considered by the court in McCray.

69. As *any* analysis of the title insurance industry will reveal: (i) the industry is *oligopolistic*, (ii) demand for title insurance is *inelastic*, (iii) price competition is *non-existent*, (iv) product costs to the consumer are *excessive*, (v) the market relationship between insurers and title agents is *captive*, (vi) insurer profits are

19

_supernormal_, and (vii) kickback schemes result from _reverse competition_[18].

70.   To prove the point, Complainant surveyed all NAIC members, establishing beyond cavil that _there is no reliable regulation_ of the most important aspect of the business of title insurance:

### THE PAYMENT OF CLAIMS

71.   In this regard, the evidence gathered by Complainant establishes that the regulation of this aspect of the "business of insurance" is dismal and hardly worthy of the gift bestowed upon the industry by McCarran-Ferguson in 1945, as per the following answers given by members of NAIC to Complainant's Freedom of Information requests[19]:

| _State:_ | _Steps taken to Regulate Claims-Adjustment Process:_ |
| --- | --- |
| ARIZONA | Title insurance is _exempt_ from regulation; |
| ARKANSAS | Title regulation is _limited_ to licensing; |
| CALIFORNIA | Regulation is _limited_ to rates and rebates; |
| CONNECTICUT | Response _promised_; |
| DELAWARE | Response _limited_ to available public records; |
| GEORGIA | Insured claims are _not_ monitored; disputes are sent to Consumer Services Division for possible resolution; |

---

[18]     _Analysis of Competition in the California Title Industry_, Birny Birnbaum, Report to California Commissioner, December 2005; _Reverse Competition_, Peat Marwick, Report to HUD, 1980; _The Title Insurance Market is Not Competitive_, J. Robert Hunter, Testimony at the National Conference of State Legislators, April 20, 2007; _Congressman Calls for Title-Insurance Investigation_, Stephen Gandel, Money, February 24, 2006; _Title Insurance Fees Paid by Borrowers Include Referral Costs_, Jack Guttentag, March 21, 2005; _Banks as Insurance Referral Agents?  The Convergence of Financial Services_, Boyer & Nyce, _Scientific Series_, Centre Interuniversitaire de Recherche Analyse des Organisations, September 2002; _Suit Calls for Reform, Refund_, Wendy Brown, The New Mexican, March 30, 2006; _Top Four Title Insurers Pay an Average of About 80% of Title Insurance Premiums to Their Title Agents in Form of Commissions_, Robert Hunter, Title Insurance Costs and Competition, April 20, 2007 @ 11; and _Insurance Division Alleges Kickbacks_, Erin Johansen, Denver Business Journal, January 14, 2005.

[19]     The survey was conducted by Complainant, individually. Some Commissioners told Complainant that the request should have been a "Public Records Request", but answered anyway.  A sample of the precise questions asked, limited to _affirmative_ steps taken to "regulate the business of _title_ insurance" is made Exhibit C.

| | |
|---|---|
| HAWAII | *No* affirmative steps are taken on *title* insurers; |
| IDAHO | *No* affirmative steps are taken on *title* insurers; |
| ILLINOIS | Request for information denied; |
| INDIANA | *No* records maintained responsive to request by Complainant; |
| IOWA | The sale of title insurance is *not* allowed; |
| LOUISIANA | Complaints are sent to insurer for a response; |
| MAINE | Insurance department will *not* become involved; |
| MARYLAND | Upon receipt of complaints, order is sent to insurer to "...enforce statutes, regulations and policies..."; |
| MASSACHUSETTS | Regulation *limited* to solvency; |
| MICHIGAN | Michigan takes affirmative action to protect the consumer through its Market Conduct Unit, whose oversight authority includes claims-handling and market conduct examinations, sometimes conducted at random; Michigan correctly separates title defects from use impediments and monitors unfair trade practices and failure to make prompt payments; |
| MISSISSIPPI | Regulation *limited* to consumer complaints; |
| MISSOURI | Request for information denied; |
| MONTANA | *No* affirmative steps taken; |
| NEBRASKA | *Will* investigate and prosecute unfair insurance trade practices; |
| NEVADA | Legal and Enforcement Section reports market misconduct to NAIC, but takes no action for bad-faith; *will not become involved* in a matter that is pending in an administrative, civil or criminal proceeding; |
| NEW HAMPSHIRE | No response, but reference made to 2008 Report on Market Competition, concluding that "...there is **not** a reasonable degree of competition in the New Hampshire Title Insurance Marketplace..." |

21

| | |
|---|---|
| NEW MEXICO | Request for information denied; |
| NEW YORK | Request for information denied; |
| NORTH CAROLINA | _No_ affirmative steps taken; |
| NORTH DAKOTA | Reference to state statutes provided; _no evidence of affirmative action apparent;_ |
| OHIO | Request for information denied; |
| OKLAHOMA | Request for information denied; |
| OREGON | Recent amendments to Oregon statutes regarding prompt and fair settlements appear to be a movement in the right direction; |
| PENNSYLVANIA | Request for information denied; |
| SOUTH CAROLINA | _No proactive investigation_ of the claims-adjustment practice is conducted; |
| SOUTH DAKOTA | Request for information denied; |
| TENNESSEE | _No affirmative steps taken_; |
| VERMONT | Non-rate regulation _limited_ to approval of (ALTA) forms and monitoring trade practices, but no details were submitted; |
| VIRGINIA | _Limited_ to submission of complaints to title insurer to "...review the handling of the claim in question..."; no further information provided; |
| WEST VIRGINIA | Request for information denied; |
| WISCONSIN | Reference to Wisconsin general statutes; |
| WYOMING | _Requests for assistance by insureds reviewed annually_ to determine if a company should be subjected to a market conduct examination. |

72. The lack of uniformity is _manifest_; the regulation of the claims-adjustment process is _non-existent_; and Iowa won't even let title insurance salesmen cross the border.

73. It is believed that, prior to Complainant's efforts above, _no_ survey has _ever_ been taken of the _title_ insurance industry to determine what, if anything, is done to merit McCarran-Ferguson immunity.

22

### *DECLARATION THAT TITLE INSURANCE IS NOT INSURANCE AGAINST UNEXPECTED FUTURE RISKS, BUT RATHER A CONTRACT WARRANTYING THE CONDITION OF THE TITLE AND THE PERMITTED USE OF THE PROPERTY[20]*

74.    For reasons earlier set forth, class complainants are entitled to declaratory relief, pursuant to 28 U.S.C. § 2201, declaring that title insurance is not "insurance" at all, because it does _not_ protect against an unexpected future risk, but is a conventional contract clothed as an insurance policy, _warrantying_ the condition of the title and the permitted use of the property on the date of issuance.

75.    Because warrantying title is _retrospective_, the payment of fees to title abstractors, title agents and title lawyers is not the "...business of insurance..." and there should be no  McCarran-Ferguson immunity for the land title industry.

*XIII.*

### *STRUCTURE OF TITLE INSURANCE MARKET*

76.    Because of the increasing numbers of title transactions from sales and refinancing, title insurance premium revenues have grown at a pace which today far exceeds the reasonable costs of providing title insurance services, a pattern aided by the lack of price competition in the marketplace, or by what is known in economic circles as "reverse competition".

77.    Reverse competition is an insidious feature particularly applicable to the title insurance industry because buyers do not "shop" for title insurance and the price of title insurance, although an expensive closing cost, is a small part of the overall transaction.

---

[20]    Complainant recognizes that this argument has been presented but rejected by some courts, but preserves the issue for later review, with particular emphasis to issue raised herein as _res nova_ matters.

78.   Because title insurance purchasers are typically ill-positioned to exert pressure on either premium prices or the terms of title policies – which are contracts of adhesion – the demand curve for title insurance is highly *inelastic*, meaning that an upward movement in unit prices will not appreciably impact the number of units sold.

79.   In addition to high *inelasticity* of demand, the sale of title insurance is driven by intermediaries such as real estate agents, title agents and lending institutions which routinely demand title insurance at the highest possible price, eliminating incentives to cost-related competition.

80.   In reporting to regulators, the title insurance industry *masks* its costs by (i) high premium splits with agents, (ii) unrealistically high administrative costs and (iii) captive reinsurance payments.

81.   Based on the many anti-competitive forces in the title insurance marketplace, the members of the title insurance oligopoly are able to protect *supernormal* profits in the 95% range as measured by claims paid versus total premiums collected, a manifestation of the "public harm" required in Sherman 1 and Sherman 2 cases.

82.   The structure of the title insurance market is molded by ALTA, which creates, modifies, amends and otherwise controls the language of the vast majority of policies in the industry; ALTA and its members recognize that the title insurance policies ALTA writes for use by the industry are contracts of adhesion, leaving a prospective insured no alternative but to adhere to the terms of the policy.

83.   ALTA's *unregulated* role in the shaping of the contract language does *not* include advocates for the insureds and does *not* represent an even-handed process where both the insured and the insurer have an equal opportunity to participate and/or negotiate for better terms.

84. The oligopolistic nature of the industry creates an even greater imbalance regarding the adhesionary title policies, given the following present distribution of financial strength, measured in assets:[21]

| | |
|---|---|
| Fidelity Family | $4,314,415,250 |
| First American Family | $2,298,966,275 |
| Stewart Title Family | $ 952,930,282 |
| Old Republic Family | $ 724,494,530 |
| Unaffiliated Companies | $ 390,562,480 |
| Investors Title | $ 112,435,367 |
| CATIC Title | $ 70,255,632 |
| Williston Title | $ 25,037,119 |
| Ohio Title | $ 23,747,153 |

85. By not offering competitively-languaged policies, and by charging parallel premiums, the industry, through ALTA, is engaging in price-fixing, a *per se* violation of Section 1 of the Sherman Act, U.S. v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948)[22].

86. But for the combination, the companies at the lower levels, such as Investors Title, CATIC Title, Williston Title and Ohio Title, could individually offer a policy that has *no* provisions for reducing the Amount of Insurance through a *deceptive* condition such as provision 8(a).

87. Even without *per se* illegality, the traditional "rule of reason" inquiry, unchanged since Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), requires a court to consider whether the questioned practice "...promotes competition or whether it is

---

[21]     Demotech: Performance of Title Insurance Companies, 2011 Edition.

[22]     On January 25, 1945, Senator Ferguson stated, *Congressional Record 79th Congress, at 484*:

> "At the present time, ***EVERY STATE RATE-FIXING AUTHORITY VIOLATES THE SHERMAN ACT OR THE CLAYTON ACT OR BOTH*.**"

such as may suppress or even destroy competition...", _Id_.

88.    The hammer in the hands of the members of the industry is all
the more powerful because virtually _all_ banking and financial institutions
_require_ the purchase of lenders title insurance and dictate the highest
conceivable amount to be purchased by a literally "helpless" borrower.

89.    In the instance of Complainant, who was forced to guaranty all
contracts and all loans, the level of title insurance dictated by OCD and
First NBC was $16,740,548; at the closing by Commonwealth's captive agent,
Lewis Title, Complainant authorized Levy Gardens to pay $ $258,395.28 in
premiums, legal fees and closing costs, thinking that $35 million of title
insurance coverage was $35 million of title insurance coverage.

90.    None of this would have happened in a competitive arena; none
of this would have happened if a system were in place where the rights of
purchasers of title insurance would have been protected; none of this would
have happened in a setting where adequate regulation of the claims-
adjustment process was in place.

_XIV._

## _OLIGOPOLY POWER, ABUSE OF OLIGOPOLY POWER,_
## _"DE MINIMIS" CLAIM PAYMENTS AND_
## _THE PROTECTION OF SUPERNORMAL PROFITS_

91.    During 1945 debates on the floor of the United States Senate,
much concern was voiced about insurance industry monopoly; Michigan Senator
Ferguson was attempting to defend his bill while Wyoming Senator O'Mahoney
was on the attack, _Congressional Record, 79th Congress, at 480_:

> "Does the Senator from Michigan desire that the
> bill, if it shall be passed by this body, shall be
> interpreted anywhere as an intention of Congress to
> permit monopoly to be established in the insurance
> industry?"

MR. FERGUSON:

> "No; by no means does the bill anticipate that any
> act would or should be passed which would create
> monopoly."

26

92.   **_That was 67 years ago_**; although monopoly power and oligopoly power are just 2 syllables apart, they work the same in the real world; (i) all members of the industry use the same ALTA forms, (ii) conscious parallelism controls conduct and (iii) _supernormal_ profits stay protected.

93.   In the title insurance business, the oligopoly is controlled as follows: the Fidelity and First American families control 63.9% of the market, while third place Stewart controls 14.1% and Old Republic keeps 11.2%, giving the Four Families 89.2% control.

94.   Without regulation, arrogance prevails: (i) Commonwealth did not bother to respond to Complainant once in 900+ days, (ii) there is no quantitative or qualitative policing of the claims-adjustment process, (iii) there are no claims adjustors to adjust the claims, (iv) the NAIC asks no questions and (v) good faith and fair dealing are concepts from Utopia, as is the case with <u>all</u> unregulated oligopolies[23].

95.   Predictably, the loss ratios reported by the title insurance industry, taken from statistics by Demotech, Inc. for ten years from 2000 to 3Q 2011 for the entire United States and Louisiana, are nothing short of vulgar:

| _Sector_ | _Premiums Written_ | _Losses Paid_ | _% of PW paid_ |
|---|---|---|---|
| All Groups United States | $164,047,576,699 | $7,444,147,455 | **4.542%** |
| All Groups Louisiana | $ 3,421,720,315 | $  62,318,521 | **1.821%** |

96.   These statistics do _not_ account for the diminished value of losses paid when the delay in making the payments is taken into account; insurers receive the premiums and _immediately_ invest the money, while the insureds' payments _languish_ for years in delayed claims-processing and tortured litigation at a Fabian pace.

---

[23]   <u>Principles of Microeconomics</u>, Karl E. Case and Ray C. Fair.

## *WHAT THE 79ᵀᴴ CONGRESS NEVER ENVISIONED*

97. When Congress convened on January 3, 1945, there was an aura of panic among the several states, as Senator Ferguson reported that "...some insurance companies had given notice to their States that they would not pay the tax which is being levied by those States, or that they would pay it under protest....so it is advisable that the bill be passed quickly...", *Congressional Record, 79ᵗʰ Congress, at 479*.

98. Senator O'Mahoney, one of the most skeptical lawmakers, expressed concern because prior to Southeastern "...insurance companies had to escape State regulation..." and more was expected, to-wit: "...the Congress proposes by this bill to secure *adequate* regulation and control of the insurance business...", *Id*, at 480.

99. Finding substantial reluctance to give the insurance industry blanket immunity from the antitrust laws, Senator Ferguson described the situation as "chaos" and "chaotic" on four occasions in an impassioned plea to the President of the Senate, *Id*, at 484, meaning that the Congress gave little thought to the quality or the quantity of the state "regulation" of such things as claims-adjustment and false and deceptive practices as has eventuated with provision 8(a).

100. At the House of Representatives two weeks later, on February 12, 1945, Missouri Representative COCHRANE was less delicate about the forthcoming protection, *Id*, at 1027:

> "...in my opinion, **no honorable insurance company or honorable agent would want to be exempted from these acts**. It will give an opportunity to fly-by-night insurance agents and companies to indulge in all the false advertising they desire, and they will be exempt from prosecution if that provision in the bill stands..."

101. The McCarran-Ferguson Act was about money to fund the State Insurance Commissioners and provide states with income from an industry which impacted the rights of everyday human beings more than any other industry, as the Southeastern court properly found in 1944.

102. But the 1945 lawmakers from the 79th Congress *never* envisioned that a subset of the insurance industry would be as financially-bloated as the *title* insurance industry; no one envisioned a 4% payout on ONE HUNDRED AND SIXTY-FOUR BILLION, FORTY-SEVEN MILLION, FIVE HUNDRED SEVENTY-SIX THOUSAND, SIX HUNDRED AND NINETY-NINE DOLLARS in title insurance premiums for risks that don't exist.

103. The 79th Congress did not have the input now available from industry analysts such as Robert Hunter, Bernard Birnbaum, Scott Wooley, Professors Eaton and Eaton, and many other detractors who have voiced the opinion that the *title* insurance industry does not need protection from the marketplace, *it is the marketplace that needs protection from the title insurance industry*.

*XVII.*

## *DAMAGES TO COMPLAINANT*

104. Unless courts allow the McCall Declaration to be reversed and unless the industry admits that it lied to the Louisiana Federal District Court (which it might), Complainant - an *in solido* debtor on millions of dollars of debt - will have been damaged in an amount in excess of $5,126,000 as to the First NBC Policy and in the realm of $2.3 million on the OCD debt.

105. The additional mengtal anguish at having been betrayed by an insurer which *refused* to meet with Complainant for over 900 excruciating days will also require measure and legal consequence.

106. Premiums paid for nothing must be returned as well, easing the debt Complainant faces, although the level of damage in other respects overwhelms this element of damages.

107. Damages to others who have relied on payment from Complainant must also be taken into consideration as third-party beneficiaries.

108. Damages similar to Complainant's damages have also been suffered by tens of thousands of victims of this industry, described by Scott Wooley as *America's Richest Insurance Racket* in Forbes Magazine on November 13, 2006.

### *XVIII.*

### *CLASS ACTION*

109. ***Numerosity.*** This class action meets the requisites of Rule 12(a)(1) of the Federal Rules of Civil Procedure because the number of ALTA LOAN POLICIES issued during the past decade exceed 600,000, resulting in premiums paid to the industry in the amount of ONE HUNDRED SIXTY-FOUR BILLION, FORTY-SEVEN MILLION, FIVE-HUNDRED SEVENTY-SIX THOUSAND, SIX HUNDRED NINETY-NINE ($164,047,576,699) DOLLARS, making the class so numerous that joinder of all members is impracticable.

110. ***Commonality.*** This class action meets the prerequisite of FRCP Rule 23(a)(2) because all title policies created by ALTA and uniformly used by the *Four Families of the Title Insurance Industry* and their subsidiaries are *verbatim* the same and contain the same provision 8(a) which is available to be invoked against any of the hundreds of thousand of policyholders of ALTA policies, issues of law and fact that are common to the class and to all defendants.

111. ***Typicality.*** This class action meets the prerequisites of FRCP Rule 23(a)(3) because the claims or defenses of the representative parties are typical of the claims or defenses of the class as a whole.

112. ***Adequate Protection.*** This class action meets the prerequisites of FRCP Rule 23(a)(4) because Complainant, having personally experienced the false and deceptive practices complained-of will fairly and adequately represent the interests of the class and is well-motivated to prosecute the claims of the members of the class.

### *REQUEST FOR RELIEF*

113. Complainant prays for the following relief:

- ❑ Declaratory Judgment that ALTA provision 8(a) is false, misleading and deceptive and cannot be utilized to diminish the Amount of Insurance in the context of a "use" impairment under an ALTA Zoning Ordinance;

- ❑ Declaratory Judgment that the unilateral right to apply provision 8(a) eliminates protection under the *Filed-Rate Doctrine* because it makes the Amount of Insurance "a moving target";

- ❑ Declaratory Judgment that Title Insurance is not "the business of insurance" and not protected by McCarran-Ferguson;

- ❑ Certification of a class of plaintiffs including all guarantors of loans as to which ALTA Loan Policies are issued where the insurer fails, refuses or avoids payments pursuant to provision 8(a) or by other ways and means;

- ❑ Damages and trebled damages for violations of 15 U.S.C. § 1 and 15 U.S.C. § 15.

- ❑ All other general and equitable relief available upon trial of this matter.

RESPECTFULLY SUBMITTED:

HENRY L. KLEIN, *Pro Se*
844 BARONNE STREET
NEW ORLEANS, LA 70113
(504) 586-9971
FAX (504) 586-9715
Email: henry@hlklawoffice.com

SUMMONS INSTRUCTIONS:

AMERICAN LAND TITLE ASSOCIATION
1828 L Street NW
Washington, D.C. 20036

FIDELITY NATIONAL FINANCIAL GROUP
601 Riverside Avenue
Jacksonville, FL 32204

FIRST AMERICAN TITLE INSURANCE COMPANY
1 First American Way
Santa Ana, CA 92707

STEWART TITLE GUARANTY COMPANY
1980 Post Oak Blvd, Suite 800
Houston, TX 77056

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
400 Second Avenue South
Minneapolis, MN 55401



November 29, 2011

Peter S. Title, Partner
Sessions Fishman Nathan &
Israel L.L.C.
201 Saint Charles Avenue, Suite 3815
New Orleans, LA 70170-1052

> **Re:**  Claim No.: 419726
> Policy No.: L14-0005193
> Insured: First NBC Bank
> Your File No.: 9889-28362

Dear Mr. Title:

Commonwealth Land Title Insurance Company ("CLTIC") has received the claim letter submitted by you on behalf of your client, First NBC Bank ("Bank" or "Insured") on the above policy (the "Policy"). CLTIC's preliminary analysis of the claim follows.

## Background Facts

On or about April 15, 2008, CLTIC issued the Policy in favor of the Insured on the 2006 ALTA Loan Policy form. The Policy insures a mortgage given by Levy Gardens Partners 2007, LP ("Borrower") in favor of the Bank in the amount of $3,100,000.00 which encumbers certain real property located in Orleans Parish, Louisiana as more particularly described therein (the "Subject Property"). The Policy contains a number of endorsements, including (i) an ALTA form 3-06 Zoning Endorsement (the "Zoning Endorsement") and (ii) an endorsement changing the effective date of the Policy to October 7, 2008 and the policy limit to $5,126,000.

The Borrower was sued in early 2009 by neighboring property owners, alleging that the zoning for the property did not include the right to build multi-family housing. The court entered a preliminary injunction prohibiting the construction of multi-family housing on the Subject Property unless a conditional use permit was issued by the New Orleans City Council. The Borrower appealed this ruling, which was ultimately affirmed by the New Orleans Supreme Court. The Borrower has not sought a conditional use permit from the New Orleans City Council.

Instead of seeking the conditional use permit, the Borrower instead sued CLTIC for breach of contract and for bad faith. Trial on this matter was held in September, and the court has indicated that it will rule on the case on November 30, 2011.



The Insured was aware of the proceedings, as it was subpoenaed for trial in connection with the Borrower's suit against CLTIC. Until the letter triggering this claim was submitted by the Insured, no claim had been made by the Insured regarding the events described above.

To date, the Insured has not joined the proceedings brought by the Borrower against CLTIC nor has the Insured foreclosed its mortgage.

CLTIC has requested additional documents from the Insured in connection with this claim. To date, CLTIC has not received the requested documents. As a result, its investigation of this claim is incomplete as of the date of this letter.

## The Policy

The Policy contains the following conditions:

## CONDITIONS

### 1. DEFINITION OF TERMS
The following terms when used in this policy mean:

(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

(i) the amount of the principal disbursed as of Date of Policy;

(ii) the amount of the principal disbursed subsequent to Date of Policy;

(iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

(iv) interest on the loan;

(v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi) the expenses of foreclosure and any other costs of enforcement;

(vii) the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

(viii) the amounts to pay taxes and insurance; and

(ix) the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

## 8.     DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i) the Amount of Insurance,

(ii) the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

In addition, the Zoning Endorsement provides

2. There shall be no liability under this endorsement based on

a. Lack of compliance with any conditions, restrictions or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This paragraph 2a does not modify or limit the coverage provided in Covered Risk 5.

This endorsement is issued as part of the policy. Except as t expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all the terms and provisions of the policy and of any prior endorsements.

## Analysis

The analysis presented here is preliminary in nature, as the Company has not completed its investigation of this matter. As noted above, documents requested from the Insured have not yet been provided to the Company.

The Policy only covers an actual loss, as noted in Condition 8 quoted above. The Insured has not foreclosed upon the Subject Property. It therefore has not suffered an actual loss at this time as the result of the zoning not being as insured.

The Zoning Endorsement only provides coverage for zoning not being as insured after all necessary consents have been sought. As noted above, the Borrower has the option of seeking a conditional use permit to obtain the correct zoning. The Borrower has failed to take action to do so. Under the provisions of the Zoning Endorsement, there is no coverage for the failure of the zoning to be as insured at this time, as the zoning can still be made as insured through the conditional use permit process.

The measurement of loss under the Policy, were the Insured to foreclose and take ownership of the Subject Property and unsuccessfully seek a conditional use permit (and further assuming that there were no other impediments to coverage), is the diminution of value in the Subject Property with the additional use restrictions. CLTIC has performed a diminution in value analysis of the Subject Property in connection with its on-going litigation with the Borrower, and determined that the diminution in value is, at most, $605,000.00.

The Company is only obligated to pay this loss once. It is already being sued by the Borrower on an owner's policy that provides coverage for the same alleged defect. The Insured must take the necessary steps to insure that it acquires the Borrower's right to this payment or risk waiving its right to the payment.

Conclusion

For the foregoing reasons, CLTIC is likely to deny the claim as presented based on the information currently available to CLTIC once it completes its investigation. If you have additional information that you believe CLTIC should consider in connection with this matter that you have not previously provided, please submit that information to me.

Nothing contained in this letter is intended as, nor should it be deemed to constitute, a waiver or relinquishment of any of CLTIC's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Very truly yours,

Charles S. McCall
Senior Major Claims Counsel/SVP

CSM/ss

1    A.    875 Waterman Road, North Jacksonville, Florida.

2    Q.    By whom are you employed?

3    A.    Fidelity National Title Group.

4    Q.    What is your current title?

5    A.    I'm the national major claims counsel for the Fidelity

6    National Title Group. I carry the title of senior vice

7    president.

8    Q.    Could you state for the Court what your educational

9    background is?

10   A.    I graduated from college with a BS in 1985, and graduated

11   from law school in 1988 from the University of Florida. You

12   asked about education.

13   Q.    And did you become licensed to practice after you graduated

14   from the University of Florida Law School?

15   A.    I did.

16   Q.    Where was that?

17   A.    Florida.

18   Q.    And have you practiced law after your graduation in 1988?

19   A.    I have continuously, in Florida, since 1985.

20   Q.    Would you give a brief description of the law firms with

21   whom you have been employed?

22   A.    Sure. For the first year out of law school I practiced at a

23   small firm known as Oyer, Cancellor and Oyer that did plaintiff's

24   personal injury and some commercial and real property

25   I then worked at another law firm known as Matthews Os

EXHIBIT
B

1  McNatt and Cobb that did primarily insurance defense, but
2  it had a small commercial litigation and transactions unit. I
3  worked in that unit doing commercial litigation, commercial and
4  residential transactions, for a year-and a half.  I then went to
5  the law firm of Kirshner Mayne Petrie Graham and Tanner, which
6  was a boutique law firm specializing in commercial transactions
7  and commercial litigation. I worked in the commercial litigation
8  unit in that law firm until 1998 when that firm became a part of
9  Holland and Knight. And I remained at Holland and Knight after
10  that, becoming a partner specializing in primarily real estate
11  litigation.

12  Q.  And how long did you stay at Holland and Knight?

13  A.  I was at Holland and Knight just slightly more than ten

14  years, before coming to Fidelity.

15  Q.  When did you begin work at Fidelity?

16  A.  At the end of February 2008.

17  Q.  And what is your job at Fidelity at this time?

18  A.  As the national major claims counsel, I am responsible for

19  handling claims where there is potential exposure, generally of

20  somewhere certainly in excess of $1 million, usually in excess of

21  $5 million, all over the country. I'm also responsible for

22  handling any re-insurance reporting that needs to be done.

23  Q.  Are you here today as the corporate representative of

24  Commonwealth Land Title Insurance Company?

25  A.  I am.

1    am familiar with the endorsement that's at issue and has been

2    briefed many times over and has been spoken about for the last

3    day plus. So maybe we can ask him questions that have some new

4    factual information that I don't already have.

5    BY MR. FELDMAN:

6    Q.    What are endorsements?

7    A.    Endorsements are amendments to the policy. They change

8    either conditions to the policy, or they may add coverages to the

9    covered risks covered by the policy. They may change or remove

10   exclusions to the policy.

11   Q.    Does Fidelity write zoning insurance?

12   A.    It does not, not as a separate policy.

13   Q.    Is there a provision in the policy for the calculation of

14   damages if there is a loss?

15   A.    Yes, there is a Condition No. 8 that specifies how damages

16   are to be determined.

17   Q.    And is there any other provision in the policy for

18   calculating them?

19   A.    I am not aware of any other provision.

20   Q.    Do you know how one would determine a loss under the terms

21   of the agreement?

22       MR. LUND: Objection. I think the question was, how

23   does one determine the loss under the terms of an agreement?

24   BY MR. FELDMAN:

25   Q.    The insuring --

**Law office**
**HENRY L. KLEIN**
**ATTORNEY AND COUNSELOR AT LAW**
844 Baronne Street
NEW ORLEANS, LOUISIANA 70113-1103

**Telephone: (504) 586-9971**                                    **Telecopier: (504) 586-9715**

February 23, 2012

## <u>FREEDOM OF INFORMATION REQUEST</u>

**Via Fax (307)777-2446**

The Honorable Ken Vines
Commissioner
Wyoming Insurance Department
106 East 6th Avenue
Cheyenne, Wyoming 82002-0440

      **RE:   REGULATION OF CLAIMS-ADJUSTMENT PROCESS IN TITLE
           INSURANCE**

Dear Commissioner Vines:

    This Freedom of Information Request is very <u>*limited*</u>. It applies only to the land title insurance industry and to no other aspect of the business of insurance.

    **FOI Request No. 1.** Please state what <u>*affirmative*</u> steps are taken by your Department of Insurance to regulate the business of title insurance, other than regulations addressing the establishment of premiums or rate-making.

    **FOI Request No. 2.** Please state what <u>*affirmative*</u> steps are taken by your Department of Insurance to regulate the business of title insurance once an insured makes a direct claim with the title insurer regarding either (a) a title defect or (b) a "use" impediment.

    **FOI Request No. 3.** Please state what <u>*affirmative*</u> steps are taken by your Department of Insurance to regulate the business of title insurance regarding the insurer's duty of good-faith and fair-dealing in connection with direct claims made by an insured.

    **FOI Request No. 4.** Please state what <u>*affirmative*</u> steps are taken by your Department of Insurance to regulate the business of title insurance regarding the insurer's duty to adjust claims fairly and promptly.

    With kind regards, I remain

                         Very truly yours,

                         HENRY L. KLEIN

HLK:hlk


EXHIBIT
C

TRANSMISSION VERIFICATION REPORT

TIME   : 02/24/2012 09:31
NAME   : HEISLER KLEIN
FAX    : 5045869715
TEL    : 5045869971

| | |
|---|---|
| DATE.TIME | 02/24  09:30 |
| FAX NO./NAME | 13077772446 |
| DURATION | 00:00:27 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |